*Warden, J.
On the 15th day of June, 1841, the plaintiffs [535 recovered a judgment against Wm. Hawke for $1,710.02 which operated as a lien on Hawke’s lands, described in the bill, from June 14, the first day of the term.
On the same 15th day of June, a mortgage by Hawke to Simeon Jennings for about $1,625 was signed, and Jennings was counting the money lent on it, and the sheriff, who held several executions against Hawke, was about to receive $1,300 of the money lent to apply to those judgments, when Jennings, learning that another judgment had just been taken against Hawke, said he could not let the money go. To remove this difficulty, Hiram Griswold, who was the attorney of the present plaintiff, and took the judgment referred to, made the following agreement with Jennings:
“Know all men by these presents, that, whereas, we have this day taken judgment in the court of common pleas of Carroll county, Ohio, against Wm. Hawke, of said county, for one thousand seven hundred and ten dollars and three cents and costs; and, whereas, said Hawke has this day given .to Simeon Jennings a mortgage on a half-section of land in said county to secure the payment of sixteen hundred and twenty-five dollars in one year without interest, which money has been this day advanced by said Jennings for the purpose of discharging liens on said lands; now this memorandum witnesseth, that in consideration of the premises, and of one dollar received of said Jennings, we hereby release to said Jennings, and to his heirs and assigns, any lien which we may have on said land < by virtue of said judgment, hereby giving and allowing to him the preference over us in the liens on said land.
“ Wilson, Yogle & Siegers,
“By Hiram Griswold, their Attorney.”
On the faith of this arrangement, the loan was completed, the mortgage to Jennings was fully executed and delivered, and the money was applied by the sheriff to the extent of $1,300 in the payment of several judgments against Hawke. The several executions in the hands of the sheriff were as follows:
1. One from said Carroll county, April 2, 1841, in favor of
Hampton, Aten & Co. v. Wm. Hawke, for................... $513 09
and costs.................................................:............. 9 83
2. One from Holmes county, March 12, 1841, in favor of
Bancroft et al. v. Hawke, for.................................... 260 40
and costs............................................................... 8 32
*536, 537 536] *3. OnefromSummitcounty,receivedApril27,1841,
in favor of Bancroft et al. v. Hawke, for..................... 403 00
and costs............................................................... 8 05
4. One received in fall of 1840 from said Carrol) county,
in favor of Bank of Massillon v. Hawke, for............... 932 40
and costs............................................................... 12 44
The last mentioned execution was not, practically, a lien on Hawke’s lands. It was levied on goods and chattels fully sufficient to meet its demand. The others were levied on a tract of about 145 acres, which was variously appraised at different times during the progress of the several proceedings before us, at sums which indicate that it would have been worth to complainants, had they chosen to purchase under their execution, at least the $2,800, for Which Griswold afterward contracted to sell it. Under the hammer this tract would probably have brought not less than $2,500.
On the Hampton, Aten & Co. execution Hawke had paid all but a small balance, which the sheriff, when he testified in this case, could not precisely state. If we suppose that balance to have been $100, we will be supported by the evidence. Adding this sum to the’ amount of the two Bancroft executions, we should have the following amounts to be made out of the tract of land mentioned, and another owned by Hawke, and worth, under the sheriff’s hammer, say $1,000, viz:
The three executions levied before June term.................$ 779 97
Plaintiff’s judgment.................................. 1,710 02
A second judgment in favor of Massillon-Bank, taken at
June term, 1841.................................................... 1,134 20
Probable amount of costs if land were sold.................... 100 00
Total................................................. $3,723 99
Now, even supposing Hawke to have had no other moans of payment than such as would be the result of a sale of these lands, two considerations here present themselves. In the first place, the testi537] mony shows clearly that the complainants ^themselves might well have purchased these tracts of land, the one for $2,800, and the other for $1,000, and thus saved themselves as' well as paid the other liens. In the next place, they could not have lost more than one or two hundred dollars had the land been forced to sale without their bid. This is a liberal and fair calculation, considering all the facts, and especially these two: Mr. Griswold repeatedly as *538 sured bis clients these lands were worth considerably more than we have here supposed, and ho afterward contracted to sell the tract of one hundred and forty-five acres for $2,800.
But the supposition that Hawke had .no means other than these lands, does not consist with the evidence.
The loan of Jennings was, as he says, $1,450; on which he secured the interest of 12 per centum for one year. After paying the first execution of the Massillon Bank, there would remain of this sum only $505.16, to pay the $779.77, for which the sheriff held three other executions against Hawke. Yet it appears that on the day after the Jennings loan, Hawke fully paid the execution, and must have otherwise procured the balance of $274.81, after exhausting the amount of the money got from Jennings. True, the payment of the first Massillon Bank execution released the goods levied on under that execution; but, to say nothing of the improbability that, in the short time which there was between the release and the payment referred to, anything could have been realized by selling all or part of the goods so released, there is testimony to convince us that these goods remained in Hawke’s possession till again subjected to levy.. The amount made out of them on the second execution of the Massillon Bank, shows them to have been undiminished. They paid something like $950 on the judgment in the case last mentioned. A passage in the testimony given in this cause by the sheriff who made the levies, is very satisfactory evidence that we are not mistaken in supposing Hawke to have had some other available means than those produced by the mortgage. The witness says: “ As to the two executions of Bancroft & Co., I applied the remainder of the ^balance of said sum of $1,300, which, to- [588 gether xoith other means that Hawke paid me, and which he had raised by sale of wheat, efe., and other means, discharged said writs in full,on the 16th day of June, 1841. I know that Hawke had got money from different sources previous to and about that time.”
It is thus quite apparent that all the probabilities were in favor of a full payment of all liens had these lands been put to sale; that some of the debts secured by the liens would probably have been discharged out of Hawke’s other means; that in no case could the complainants have sustained any considerable loss; and that there could be no sort of propriety in diminishing Hawke’s ability to pay by charging on the land large interest on a loan for a year. Yet, in the face of these facts, the attorney for Wilson, Vogle & Siegers *539 agreed with Jennings, as we have seen, that “for the purpose of discharging liens on said lands,” a preference might be given to the Jennings mortgage. This arrangement was nothing less than a release of the plaintiff’s priority of lien. It was a discharge of their security to that extent; and whether fraudulent or not, was certainly done to the hurt of complainants. Without express or implied authority from his client other than that of his mere retainer to collect by suit, an attorney can not release a lien obtained by judgment, or discharge any like security resulting from his prosecution of the claim. A large number of authorities might be cited to sustain this proposition, and though many instances of a contrary opinion and action on the part of the profession may be furnished by the practice of attorneys, no authoritative decision has been found to break the chain of cases establishing the limitation we have supposed to the real power of an attorney under a common retainer. Had Mr. Griswold, then, any such express or implied authority outside of his retainer? We can not so find from the evidence. His own answer in this case limits his express authority to the usual employment of an attorney in such cases. He did not communicate to his client the knowledge of the manner in which, 539] as he told them, the Jennings mortgage ^constituted a preferable lien. He spoke of it as a fact, but did not explain how it came to be a fact. Certainly no implied authority is shown for a proceeding so manifestly not in the plaintiffs’ interest.
Without, therefore, imputing any actual fraud to Mr. Griswold, it is plain that the arrangement he' made was not within his authority as an attorney, and can not be upheld.
On the 25th of September, 1841, an execution on the plaintiffs’ judgment was levied on both of the tracts of land referred to. It is certain that, between the 15th of June and the 19th of July, Mr. Griswold might have caused a levy on the personal property before mentioned, out of which a large part of plaintiffs’ judgment might have been made. The levy of the second Massillon Bank execution was not made till the last day mentioned. It is difficult to see why Mr. Griswold did not anticipate that levy, by a proceeding in favor of his own clients; but, however that may be, the plaintiffs’ execution commenced proceedings which resulted in a sale to Jennings of both tracts of land, under a second agreement with Mr. Gris-wold, as the attorney of these complainants. This agreement was in writing, and provided that Jennings should bid two-thirds for *540 the land on complainants’ writ; that the sale should be confirmed! .and a deed should be executed to Jennings; that Griswold should receipt for the money as though paid, althorigh it was not to be in fact paid, and that Jennings, on or before March 1, 1844, should! sell the lands at private sale, or by auction, to the highest bidder, and pay the proceeds as follows: 1. To satisfy the second judgment of the Massillon Bank. 2. To discharge the judgment obtained on the mortgage noté by Isaac Webb, a brother-in-law of Jonnings, to whom the latter had assigned his claim. 3. To satisfy complainants’ judgment,<l if proceeds would go that far.”
Meantime, however — that is to say, between the time of complainants’ levy under their judgment and the said sale to Jennings,. Mr. Griswold undertook the collection of the *Jennings mort- [540’ gage for Isaac Webb, the assignee; and having taken judgment at law, immediately filed a bill in chancery in behalf of Webb, and aphis solicitor, against Wilson, Yogle & Seigers, and other judgment, creditors of Hawke, to settle the question of the priority of liens.
Of this proceeding, though the usual jmblieation was made, Wilson, Yogle & Seigers had not actual notice, and they were not, while it lasted, informed of its character. This is evident from the letters-of Griswold, and Griswold & Grant. But Mr. Griswold, under his employment to collect the judgment of complainants, appeared for them as defendants in the Webb chancery proceeding, answered for them, claiming a lien not prior, but subsequent to Webb’s, and, as-Webb’s solicitor and theirs, caused a decree to be entered, finding the priority of Webb’s mortgage claim to the judgment of complainants, and the priority of a balance on the second Massillon Bank judgment, over both the other liens.
It is singular that, in a letter written by Mr. Grant to complainants, under date of May 20, 1842, he says: “ There are chancery proceedings against Hawke, out of which we expect to get something, and we think we may ultimately realize the whole claim, but. some time will elapse, probably, before any of it will be paid.” And, under date of June 13, 1842, the same gentleman wrote again, in answer to a letter inquiring as to the nature of the chancery j>roceedings. Mr. Grant makes some explanation on this subject in his letter. We are not sure that any testimony quite enables us to-understand this feature of the case.
We know of no chancery proceedings having been instituted against Hawke at the date of these letters. The Webb proceeding *541, 542 was commenced in the succeeding October. We find in these letters no request of authority to act in any case pending in chancery, and the statement is such that no man to whom it was addressed could regard it as contemplating proceedings yet to be commenced, 541] and asking ^authority to join in them. Nor can the letter of Mr. Griswold, under date of October 17, 1842, be regarded in any more favorable light as to authority to act in the Webb case. It runs as follows : “ Mr. Hawke’s land is not yet sold, and such is the scarcity of money that it is difficult to say when it will be. You have a lien on a body of land worth from $4,000 to $5,000, subject to a prior mortgage incumbrance of about $1,750; but, as we have the collection of that also, we are determined that the land shall not be sold for a less sum than will pay you.”
We find in none of these letters an accurate account of the chancery proceeding. It nowhere appears that complainants were parties, or to be made such. That they were to get the benefit of chancery proceedings is intimated, and a lawyer would thus understand that the complainants must be made parties; but it can not be fairly said, that such would be the understanding of the merchants, who were Mr. Griswold’s clients.
In this state of fact it is plain that the complainants never authorized or ratified the acts of Mr. Griswold, in the chancery case, except so far as the retainer to collect their debt extended. We find it unnecessary to decide whether the authority thus conferred would warrant Mr. Griswold to enter the appearance of complainants in the Webb chancery proceedings, had they been commenced by an adversary attorney. Supposing that the appearance would in such case be good, and allowing that no actual fraud was committed either by Webb or by Griswold, we must still hold that Webb, charged as he is with the knowledge of all the facts relating to Griswold’s unauthorized postponement of complainants’ lien, could not employ Griswold as counsel in consummating the wrong alxeady done, without subjecting himself and his decree to the usual consequences of a constructive fraud. It is clear that Webb must have known of the facts attending the postponement of complainants’ lien. The record would show priority in complainants, and to avoid it, Webb would take from Jennings the paper executed by Gris-wold. Under these circumstances, we think, the decree procured ■542] *by the employment and action of Mr. Griswold to which we have alluded, can not stand against this bill to impeach it.
*542 The lands were, after the date of the decree in favor of Webb, sold by Jennings at auction. Webb was the purchaser at $2,300.
Disaffirming the unauthorized acts of their attorneys, the complainants brought suit at law against Jennings to recover the unpaid amount of his bid. In that suit, they could not avoid the decree finding Webb’s priority; while, allowing that priority, there could not be a full recovery of the sum due complainants. But, for some cause which we can not ascertain, the recovery was for a less sum than, even allowing Webb’s priority, would come to the plaintiffs if they recovered at all.
It is here objected, that these proceedings at law bar the complainants in a court of chancery. We do not so understand the law. The complainants were not making an election between two equal remedies, one at law, the other in chancery ; they were proceeding at law, as far as they could, and they now come into ■chancery, as we think they lawfully may, to complete the remedy to which they are entitled.
Since, however, the complainants might have recovered in this action at law an amount equal to the balance of Jenning’s bid, .after paying the Massillon Bank and Webb, it is our opinion that they ought to be charged with that amount now; and that the lands in the ownership of Webb can be charged only with the difference between that amount, and the whole sum claimed by complainants, after deducting the payment made by Griswold, of fifty dollars, or thereabouts.
The objections to the bill now insisted on, do not appear to be ■such as to warrant us in dismissing it. It is substantially a bill to impeach the Webb decree for fraud.
A majority of the court is of opinion that the decree ought to be set aside, so far as Webb’s priority is concerned, and that complainants should have such a decree as we have already intimated.
Ranney, J., dissented.